IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRANDIE WILLIAMS                    )
                                    )
        Plaintiff,                  )
                                    )
        vs.                         )    Civil Action No. 05-879
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Brandie Williams and Defendant Jo Anne
B. Barnhart, Commissioner of Social Security. Plaintiff seeks
review of a final decision by the Commissioner denying her claim
for supplemental security income benefits ("SSI") under Title XVI
of the Social Security Act, 42 U.S.C. §§ 1381 et seq.[1] For the
reasons discussed below, Plaintiff's motion is denied, Defendant's
motion is denied, and the matter is remanded to the Commissioner
for further consideration.

---

[1] A person is eligible for supplemental security income benefits
if he is "disabled" (as that term is defined elsewhere in the
regulations) and his income and financial resources are below a
certain level. 42 U.S.C. § 1382(a).

## II.   **BACKGROUND**

### A.   Factual Background

Although Brandie Williams worked intermittently as a child caretaker, hairdresser, and cook/cashier, she claimed she became disabled as of June 1, 2001, due to depression, post-traumatic stress disorder, and migraine headaches. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 5, "Tr.," at 148.)   In a disability report dated February 22, 2003, Ms. Williams stated that she had been "a normal person" until she was raped at age twelve, after which she became "withdrawn, depressed and very, very angry." (Tr. 143.)   Despite intermittent treatment, her "uncontrollable rage," coupled with depression and chronic sleep disturbances, interfered with her ability to maintain employment.   (Id.)

### B.   Procedural Background

On February 19, 2003, Ms. Williams filed an application for supplemental security income benefits. (Tr. 81-84.) Her application was denied on July 10, 2003 (Tr. 32-33); she then timely requested a hearing before an Administrative Law Judge ("ALJ") on August 12, 2003(Tr. 63.)

On September 14, 2004, a hearing was held before the Honorable James J. Pileggi at which Plaintiff was represented by counsel. Judge Pileggi issued his decision on December 17, 2004, again

denying SSI benefits.  (Tr. 12.)  The Social Security Appeals
Council declined to review the ALJ's decision on April 28, 2005,
finding no error of law or abuse of discretion and concluding the
decision was based on substantial evidence to support the ALJ's
findings.  (Tr. 4-6.)  Therefore, the December 17, 2004, opinion
became the final decision of the Commissioner for purposes of
review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546,
549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107
(2000).  Plaintiff filed suit in this Court on June 27, 2005,
seeking judicial review of the ALJ's decision.

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact.  42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of

3

Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

     This Court does not undertake de novo review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d
Cir. 1986) (the substantial evidence standard is deferential,
including deference to inferences drawn from the facts if they, in
turn, are supported by substantial evidence.)  If the decision is
supported by substantial evidence, the Court must affirm the
decision, even if the record contains evidence which would support
a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S.
App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v.
Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228
F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.    The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[2] currently existing in the national economy.  The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either SSI or disability insurance benefits,[3] the ALJ conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

_____

[2]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3]  The same test is used to determine disability for purposes of receiving either type of Social Security benefits.  Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under both SSI and disability insurance benefits applications.

(2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[4] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[5] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

---

[4]   Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations.  Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[5]   Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage.  Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

Following the prescribed analysis, the ALJ first concluded that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of June 1, 2001. (Tr. 16.) Resolving step two in Plaintiff's favor, the ALJ found she suffered from back and leg pain, numbness in her hands and feet, depression, dysthymia,[6] and post-traumatic stress disorder,[7] but her migraine headaches were not a "severe impairment" as that term is defined by the Social Security Administration ("SSA.")[8] As such, the ALJ did not consider that condition in his subsequent analysis.

---

[6] Dysthymia is defined as "a mood disorder characterized by depressed feeling, loss of interest or pleasure in one's usual activities, and by at least some of the following: altered appetite, disturbed sleep patterns, lack of energy, low self esteem, poor concentration or decision-making skills, and feelings of hopelessness. Symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depressive disorder." See www.mercksource.com, DORLANDS ILLUSTRATED MEDICAL DICTIONARY.

[7] Post-traumatic stress disorder is "an anxiety disorder caused by exposure to an intensely traumatic event, characterized by re-experiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyper-alertness and difficulty in sleeping, remembering, or concentrating." See www.mercksource.com, DORLANDS ILLUSTRATED MEDICAL DICTIONARY.

[8] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n5.

At step three, the ALJ concluded that Plaintiff's musculoskeletal pain and numbness did not result either in an inability to ambulate effectively or to perform fine and gross movements, or in a significant and persistent disorganization of motor functions. Therefore, he concluded her physical limitations did not satisfy Listing 1.02A or 1.02B (major dysfunction of a joint due to any cause), 11.04B (central nervous system vascular accident), or any other impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[9]  (Tr. 18.)  Similarly, he concluded that her mental disorders did not satisfy Listing 12.04 (affective disorders) or 12.06 (anxiety related disorders.)  (Tr. 18-19.)

At step four, Judge Pileggi concluded Ms. Williams had no past relevant work.  (Tr. 20.)  He therefore incorporated in his analysis the answers to hypothetical questions posed to a vocational expert ("VE") who testified at the hearing, Mr. Samuel Edelman.  (Tr. 19.)  Mr. Edelman had stated there were numerous light[10] jobs such as hotel cleaner, office cleaner, stock clerk, or

---

[9]  On appeal, Plaintiff concedes that the ALJ's decision not to consider the migraine headaches was not error and, in fact, does not appeal any part of his decision with regard to her physical capabilities.  (Plf.'s Brief at 2-3.)

[10]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do

8

walking security guard which an individual of Ms. Williams' age, education, and physical/mental limitations could perform in the local or national economy. (Tr. 21.) Based on Plaintiff's status as a younger individual[11] with an eleventh grade education, and no relevant work history, together with the medical evidence of record and the testimony of the VE, the ALJ determined at step five that Ms. Williams was not disabled and, consequently, not entitled to benefits. (Tr. 20.)

B.   Plaintiff's Arguments

Ms. Williams argues the ALJ erred in two ways. First, he erred as a matter of law by failing to give appropriate weight to the evidence supplied by her treating source at Western Psychiatric Institute and Clinic ("WPIC") which, in turn, was supported by an assessment of a consultative psychological examiner. As a corollary to this argument, she claims the ALJ failed to explain why he gave greater weight to the opinion of a mental status examiner dating from 2001 over more recent medical evidence. (Plaintiff's Brief in Support of Her Motion for Summary Judgment,

---

substantially all of these activities." 20 C.F.R. § 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[11]   Plaintiff was 26 years old at the time of the hearing, making her a "younger" person according to Social Security regulations. 20 C.F.R. § 416.963(c).

9

Docket No. 8, "Plf.'s Brief," at 10-15.)   Second, the ALJ's
decision was not based on substantial evidence in light of faulty
hypothetical questions to the VE.  That is, the questions posed by
the ALJ failed to accurately set forth all the specific work-
related limitations documented in the administrative record.  (Id.
at 16-19.)  We address each of these arguments in turn.

        1.  *Failure to give appropriate weight to the opinions of
Plaintiff's various medical sources:*  The initial problem with the
ALJ's determination regarding the severity of Plaintiff's mental
impairments and his subsequent determination of her residual
functional capacity is that he failed to analyze the evidence
concerning Ms. Williams' psychiatric hospitalization in May 2002
and her follow-up treatment.  We conclude this lack of analysis is
sufficiently serious that we are unable to determine if his opinion
is based on substantial evidence.

    On May 15, 2002, Ms. Williams checked herself into WPIC in
Pittsburgh, Pennsylvania, after a confrontation with her neighbors,
claiming they had stolen her porch furniture and threatened her in
a store. She stated, "If they mess with me, I'm going to kill
them."   (Tr. 235.)   The WPIC intake notes indicate that Ms.
Williams stated she heard voices telling her to kill her neighbors,

10

believed people would attack and rape her,[12] and was unable to sleep because she was constantly listening for someone to break into her home. Symptoms included hallucinations, sleep disturbance, eating disturbance, and obsessive compulsive behavior. (Tr. 235.)

When she was discharged from WPIC six days later on May 21, 2002, she stated she was in a good mood, without suicidal or homicidal ideation (Tr. 234,), although she later admitted she had minimized her symptoms in order to be released (Tr. 233.) Her diagnoses upon discharge were depression and post-traumatic stress disorder, with a need to rule out psychoses. (Tr. 234.) In a follow-up appointment on May 22, she continued to report "good" and "bad" auditory hallucinations and paranoia about her neighbors (e.g., believing they would kill her and were tapping her telephone lines.) (Tr. 231.) The mental status exam described her as neatly dressed, alert, oriented, guarded at the beginning of the therapy session, pleasant and cooperative, with a mood described as "okay," depressed affect, normal speech tone and rate, tangential thoughts, and fair insight. (Tr. 232.) Although she refused inpatient care, she did agree to attend outpatient therapy. Dr. Jason Rosenstock

---

[12] In 1991, when Ms. Williams was 12 years old, she was raped by a step-uncle. (Tr. 240-266.) Following that traumatic event, she received some follow-up treatment and therapy, but was hospitalized in 1994 due to suicidal ideation. (Tr. 172-179.) In August 2001 when she was examined by Dr. Cohen, however, she had not been in therapy or taking medication for at least two years. (Tr. 190.)

11

prescribed risperdal, verapamil and zoloft (later replaced by celexa.)[13]   (Tr. 232-233.)

From May 29, 2002, through at least April 4, 2003, Ms. Williams continued to meet on an individual basis with a therapist at WPIC and with a medical doctor for medication management sessions.   (Tr. 268-287.)   She reported her psychotic symptoms (paranoia and auditory hallucinations) lessened after she began taking risperdal, but she continued to have inter-personal problems, for example, repeated verbal conflicts with her son's school principal (Tr. 285), ongoing anger management problems (Tr. 279), sleep difficulties (Tr. 276, 280), and flashbacks, unresolved feelings and nightmares associated with the rape (Tr. 271, 275.) In the notes from the last session which appears in the record, Ms. Williams was described as casually dressed, groomed, alert, cooperative with good eye contact, spontaneous and normal speech, organized and goal-directed thought form, and an affect appropriate to the topic.   (Tr. 268.)

The ALJ referred only three times to the WPIC treatment notes.

---

[13]   Risperdal is an antipsychotic drug used to treat the symptoms of schizophrenia, episodes of mania, or manic depressive disorder. Zoloft is prescribed to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder.   Celexa is also used to treat depression.   Verapamil is usually prescribed to treat irregular heartbeats and high blood pressure, but may also be prescribed for migraine headaches.   *See* www.nlm.nih.gov/medlineplus/druginfo.

He commented that her medical records included complaints of pain in her lower back, legs, feet and knees, along with tingling in her hands and feet. (Tr. 17, *citing* Exhibit 12F, WPIC progress notes for the period May 8, 2002, through April 4, 2003, Tr. 267-299.) While this is a correct citation to one portion of that Exhibit, it does not relate to Ms. Williams' psychological impairments. He also refers to Exhibit 12F when discussing the fact that in May 2002, Plaintiff was prescribed medication for migraine headaches. (Tr. 18.) Again, this is an accurate citation which has little or nothing to do with Plaintiff's claims of mental impairments. He refers to Exhibit 12F and Exhibit 9F (WPIC records for the period May 15, 2002, through July 31, 2002) in addressing "claimant's subjective complaints of anger control issues, anhedonia, fleeting suicidal ideations, auditory hallucinations, sleep disturbance, nightmares, paranoia, memory problems and low mood." (Tr. 17.) He concluded, however, that "her symptoms responded to medications when she took them as prescribed."[14] (Tr. 18.) While that seems

---

[14] Standing alone, the fact that Plaintiff's symptoms were alleviated when she took her medication as prescribed is insufficient to support a conclusion that she could perform substantive gainful activity. In Morales, a treating psychiatrist noted that although the claimant's affective and anxiety disorders were "stable and well controlled with medication," he also indicated that Morales's impairment rendered him markedly limited in a number of relevant work-related activities. Morales, 225 F.3d at 315, 317. The ALJ focused on the first point without considering the second. The Court of Appeals held that the doctor's opinion that Morales's ability to function "in every area related to work" was seriously impaired or non-existent should not be "supplanted by an inference gleaned from

13

to be true of her auditory hallucinations, her diagnosis remained major depressive disorder with psychotic features as late as March 28, 2003.  (Tr. 269.)

In determining disability, Social Security regulations require evidence and opinions from "acceptable medical sources" to establish whether the claimant has a medically determinable impairment. Such sources include licensed physicians and licensed or certified psychologists.  20 C.F.R. § 416.913(a)(1) and (2). Evidence of the severity of an impairment or its effect on a claimant's ability to work may also be provided by individuals who are not acceptable medical sources, e.g., "medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)."  Id. at (d)(1).

As a threshold matter, we note that the treatment records from WPIC are largely those of Charles Chulack, who is not identified as a licensed psychologist or psychiatrist, but rather by the letters "MSW" and "LSW," which the Court assumes indicate a masters degree and license in social work.[15]  (See, e.g., Tr. 283, 270.)  Thus, Mr.

---

treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting."  Id. at 319.

[15]  Although Defendant refers to Mr. Chulack as "Dr. Chulack" (Def.'s Brief at 10), the Court has been unable to pinpoint in the record the basis of this assumption.  If Defendant is correct that Mr. Chulack is actually a licensed psychologist, psychiatrist or other recognized "acceptable medical source," the analysis above is moot

Chulack's comments and opinions are not those of an acceptable medical source as that term is understood by the SSA.[16]

However, while eligibility for Social Security benefits cannot rest upon the opinion of an individual who is not a acceptable medical source, a "hearing examiner can consider [such an] opinion, along with all of the other evidence that a claimant may present insofar as it is deemed relevant to assessing a claimant's disability." Hartranft v. Apfel, 181 F.3d 358, 361 (3d Cir. 1999); see also Burnett v. Commissioner of SSA, 220 F.3d 112, 122 (3d Cir. 2000) (it is the ALJ's responsibility to "consider and weigh all of the non-medical evidence before him.")  We recognize that while

---

because as a treating physician, his opinions would be entitled to substantial if not controlling weight.

[16]  On occasion, Mr. Chulack's notes show that they were co-signed by a physician.  At least two courts have recognized that where a therapist's assessments are "countersigned by an unassailably acceptable medical source," such assessments may carry significantly greater weight than is normally given to opinions of individuals who are not acceptable medical sources.   Smith v. Barnhart, CA No. 04-30122, 2005 U.S. Dist. LEXIS 3458, *19-*20 (D. Mass. Mar. 4, 2005), citing Gomez v. Chater, 74 F.3d 967, 971(9th Cir. 1996), which held that where a nurse practitioner consulted with a physician numerous times and worked closely under the supervision of that physician, her opinions were entitled to consideration as those of an acceptable medical source.  The Court recognizes that Gomez was decided under Social Security regulations which provided that the "report of an inter-disciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence" (20 C.F.R. § 416.913(a)(6)), a provision which no longer appears in the regulations.  See Nichols v. Comm'r of the SSA, 260 F. Supp.2d 1057, 1064-1066 (D. Kan. 2003), distinguishing Gomez on this basis.  However, that does not change our ultimate conclusion that Mr. Chulack's observations should have been given some consideration.

such notes are not entitled to controlling weight (as discussed below), they are evidence which reflects the severity of Plaintiff's impairment. *See* Hatton v. Comm'r of SSA, No. 04-4185, 2005 U.S. App. LEXIS 9625, *4 (3d Cir. May 24, 2005) (regarding statements from a physical therapist, also outside the scope of acceptable medical sources.) Therefore, we conclude Mr. Chulack's notes, which are without question "relevant to assessing a claimant's disability," should have been considered by the ALJ.

On a related point, Plaintiff testified at the hearing on September 14, 2004, that she continued to see a therapist once a week, a psychiatrist every three months, and had an intensive case manager with whom she was in regular contact at least once a week for one or two hours at a time. (Tr. 341-342, 350-351.) Her counsel stated that he anticipated receiving an update from Ms. Williams' mental health treating source, and the ALJ agreed to keep the record open in order to receive it. (Tr. 338.) We also note that in a disability report prepared by Plaintiff on February 22, 2003, she reported she was being treated by Drs. William Musser and Paul Soloff and had received individual therapy and medication management from them. (Tr. 138, 144.) However, no medical records are provided for the period April 4, 2003, to September 14, 2004. Since the ALJ does not refer in detail to Plaintiff's treatment at WPIC in his decision, it is impossible to determine if this related

16

information was not timely provided by Plaintiff's counsel or if it was inadvertently omitted from the record. Although it is the claimant's burden to establish the severity of her impairment by providing medical records, the ALJ has a responsibility to develop the record fairly and fully, even where the claimant is represented by counsel. Rutherford, 399 F.3d at 557; Sims, 530 U.S. at 111 ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.")

Plaintiff's primary argument is that the ALJ erred as a matter of law by giving greater weight to the opinion of Dr. Charles M. Cohen than to that of Dr. Paul David Nussbaum. She contends that the ALJ "inexplicably chose" a report written in August 2001 by Dr. Cohen who examined Plaintiff in connection with a prior application for benefits which she voluntarily withdrew. Plaintiff concedes that Dr. Cohen's conclusions would not support a determination that she was disabled and also concedes that it is the ALJ's duty to weigh evidence and make choices between differing conclusions. (Plf.'s Brief at 13.) She argues, however, "it is patently clear under well-established case law that an ALJ may not merely state bald conclusions as a basis for denying benefits; an ALJ's discretion is not carte blanche to come to unexplained conclusions." (Id.) His decision that Dr. Cohen's opinion is "more consistent with the objective findings on examinations and

17

the claimant's own admitted daily activities" is inadequate because the ALJ did not identify those "objective findings" nor "daily activities" and did not explain why he gave more weight to Dr. Cohen's three-year old report rather than Dr. Nussbaum's report prepared in May 2003. Finally, the ALJ erred by failing to explain how the medical records of treatment rendered in 2002 and 2003 were consistent with Dr. Cohen's 2001 report. (Plf.'s Brief at 13-14.)

Contrary to Plaintiff's argument, the ALJ did refer to specific activities of daily living which he found inconsistent with her allegations of total disability. For instance, the ALJ's references to Plaintiff's ability to "use public transportation, work as a child care worker, fix other people's hair and walk her children to school" (Tr. 19) appear to be directly taken from Plaintiff's daily activities report (Tr. 156-165) and from her testimony (Tr. 347, 352.) He also noted "findings on mental status examinations" which did not support the severity of her mental disorders, "i.e., her memory is intact and her concentration and pace are fair; and despite her paranoia and anger toward (and dislike of) men, she is friendly and cooperative and she did not exhibit any anxiety when she was closed in a room with a male examiner." (Tr. 19.) These conclusions appear to be taken verbatim from Dr. Cohen's report. However, we agree with Plaintiff that the ALJ's decision to give significant weight to Dr. Cohen's

18

opinion is problematic both because of its timing and because the ALJ failed to explain his reliance on that report in light of Ms. Williams' psychiatric hospitalization and her subsequent mental health counseling.

Dr. Cohen, a one-time consulting psychologist, conducted a mental status examination of Ms. Williams in August 2001. (Tr. 190-195.)   His summary diagnoses were post-traumatic stress disorder and dysthymia and her prognosis was described as guarded. (Tr. 192.) Dr. Cohen concluded:

> Although this woman's symptomatology certainly does
> affect her, she does not appear to be so severely
> impaired as to preclude all employment. . . . She would
> be capable of coming to work on time, of dealing
> reasonably well with authority figures and peers, but
> probably should not be working generally with the public.
> She would be able to concentrate well enough to perform
> only simple repetitive tasks in a relatively low
> stressful environment.

(Tr. 192.)

Dr. Cohen completed a mental RFC assessment of Ms. Williams' ability to do work-related activities in which he noted that she had fair ability to make all occupational adjustments except working with the public, poor or no ability to understand and carry out detailed and/or complex job instructions, and fair ability to make personal-social adjustments.[17]   (Tr. 193-195.)

---

[17] According to definitions in the form, "fair" ability in a given area indicates ability which "is seriously limited but not precluded." A rating of "poor or none" indicates "no useful ability to function in

19

We find the ALJ's treatment of Dr. Cohen's report and his conclusions similar to that of the ALJ in Cadillac v. Barnhart, No. 03-2137, 2003 U.S. App. LEXIS 24888 (3d Cir. Dec. 10, 2003). There, the claimant was diagnosed with chronic hepatitis C and lumbar radiculopathy. Two state agency physicians reviewed his medical records in 1996, each concluding that Cadillac was capable of engaging in light activity. Id. at *4-*5. After those assessments were completed, Cadillac's back condition was evaluated on three separate occasions in the next year by orthopedic surgeons. In her opinion denying disability insurance benefits, handed down in February 1998, the ALJ gave controlling weight to the state agency physicians' reports and "minimal" weight to the orthopaedists' opinions. Id. at *8-*9. On appeal from the district court's opinion affirming the ALJ's decision, the Court noted that the fact Cadillac was hospitalized after the state agency physicians had completed their assessments meant they never had an opportunity to consider the significant medical events which occurred in 1997. The Court held it was error for the ALJ to have favored the state agency examiners' conclusions based on an incomplete record over the physicians' opinions based on later, more complete medical records, as well as a hands-on examination. Id. at *15-*16. While this case differs somewhat from Cadillac in

this area." (Tr. 193.)

20

that Dr. Cohen's conclusions were based on an actual examination rather than only a review of the medical records, like those examiners, he did not have a full understanding of Ms. Williams mental condition and history when he reached his conclusions some three years before the ALJ made his decision to deny benefits.

On the other hand, Dr. Nussbaum examined Ms. Williams on May 22, 2003. (Tr. 304-311.) His diagnoses were recurrent major depression with psychotic features, post-traumatic stress disorder, and possible antisocial personality disorder. His prognosis was that there was "nothing from today's examination to indicate enhanced functionality." (Tr. 308.) Dr. Nussbaum also completed an assessment of Ms. Williams' work-related abilities, concluding she had poor or no ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, or deal with work stresses, while other occupational adjustment abilities (follow work rules, function independently, and maintain attention and concentration) were fair. His evaluations of her ability to make performance adjustments were identical to those of Dr. Cohen. While he believed she had fair ability to maintain her personal appearance, she had poor or no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. (Tr. 310-311.)

21

Social Security regulations carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 416.927; *see also* <u>Fargnoli v. Halter</u>, 247 F.3d 34, 43(3d Cir. 2001), and <u>Sykes</u>, 228 F.3d at 266 n7.   The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c).

Although his reasoning is not explicitly stated, the ALJ properly declined to give controlling weight to the opinion of

either Dr. Cohen or Dr. Nussbaum, apparently recognizing that they were not treating sources but only one-time consultative examiners. He noted there was "some conflict" between their opinions, but decided he would give more weight to that of Dr. Cohen suggesting Ms. Williams could perform work which involved simple repetitive tasks in a relatively low-stress environment. (Tr. 19-20.)

Defendant argues that contrary to Plaintiff's argument that the ALJ "inexplicably" gave greater weight to Dr. Cohen's conclusions, Judge Pileggi explained Dr. Cohen's opinion was "better supported by the objective findings of record and was more consistent with the medical and other evidence of record." (Defendant's Brief in Support of Her Motion for Summary Judgment, Docket No. 10, "Def.'s Brief," at 9, citing Tr. 19-20.) She goes on to explain that the ALJ declined to give significant weight to Dr. Nussbaum's opinion because it "was based on Plaintiff's subjective complaint of hallucinations, which was not supported by the evidence of record." (Id. at 10, citing Tr. 306.) She also argues that Dr. Nussbaum relied on Plaintiff's report during the examination that she had a "horrible" memory, yet was able to recall four digits forward and three backward. (Id. at 11.)

In his report, Dr. Nussbaum noted:

> Brandie stated that she hears voices, some of which tell her to fight and to spend money. She stated that she has had these auditory experiences since May 15, 2002 . . . . Brandie stated that her memory is horrible, noting that

23

sometimes she forgets her medications and has forgotten
to turn the stove off. She does remember her
appointments and was able to repeat four digits forward
and three digits backward today.

(Tr. 306-307.)

We agree with Plaintiff that there is no evidence in the
record to support Defendant's argument that these statements were
the reason for Dr. Nussbaum's conclusions. (Plaintiff's Reply
Brief in Support of Her Motion for Summary Judgment, Docket No. 11,
"Plf.'s Reply," at 4-5.) His report contains numerous other
comments about Ms. Williams' affect and mood (angry, isolating,
depressed, "somewhat extreme for thought content and situation");
psychiatric hospitalizations, including the one in May 2002; her
inability to function socially or in a work setting ("I will get
people before they get me," "carrying off and fighting the boss");
and poor concentration and persistence (refusing to try counting
backward by 7 from 100.) He also noted she "continues to ruminate
about the crime against her and has not dealt psychologically with
it. . . [She] appears to have some general sense that the incident
when she was 12 has affected her psychologically, though she does
not articulate a means for dealing with it or learning better
coping strategies for it." (Tr. 306, 307-308.) All these factors
taken together support Dr. Nussbaum's diagnoses of major depression
and post-traumatic stress disorder.

As Plaintiff points out, neither the Commissioner on appeal to

24

the district court nor the court itself can create post hoc
rationalizations to explain the ALJ's conclusions when the
underlying analysis is not apparent from the decision itself.
(Plf.'s Reply at 3, citing numerous cases.)  Further, the Third
Circuit Court of Appeals has noted that even where a district court
recognizes the ALJ's failure to consider all the relevant and
probative evidence and attempts to rectify this error by relying on
its own independent analysis, such an action runs counter to SEC v.
Chenery Corp., 318 U.S. 80, 87 (1943), requiring that "the grounds
upon which an administrative order must be judged are those upon
which the record discloses that its action was based."  Fargnoli,
247 F.3d at 44 n7. Here, Dr. Nussbaum did not give any particular
emphasis to Plaintiff's reports of hallucinations and a "horrible"
memory in arriving at his conclusions, nor did the ALJ mention
those factors in his decision.  We can therefore only conclude that
Defendant's argument in this regard is a post hoc rationalization
which this Court is not permitted to consider.

    We also find unpersuasive Defendant's argument that the ALJ
relied on the opinions of two state agency medical examiners which
were consistent with Dr. Cohen's assessment of Plaintiff's
limitations.  (Def.'s Brief at 11.)  First, the assessment by state
examiner Raymond Dalton, prepared on October 2, 2001, may have been
consistent with Dr. Cohen's opinions, but could not have considered

the medical evidence from May 2002 through April 2003 nor Dr. Nussbaum's opinion from May 2003. Therefore, any conclusions he reached, like those of the examiners in Cadillac, *supra*, were based on an incomplete record. *See also* Hippensteel v. SSA, 302 F. Supp.2d 382, 393-394 (M.D. Pa. 2001) (where a non-examining source based his conclusions on an incomplete record, "vague references to the record as a supporting explanation for his opinion cannot be given great weight.")

A second state agency examiner, Dr. Sanford Golin, prepared a mental RFC assessment on July 3, 2003 (Tr. 312-328), which did refer to Plaintiff's May 2002 hospitalization, Dr. Nussbaum's report, and a report provided by Dr. Richard A. Rydze who examined Ms. Williams on May 20, 2003. In each instance, Dr. Golin gave the reports of Plaintiff's treating sources[18] "appropriate weight," without stating what that weight might be, and found their conclusions "partially consistent" with his own assessment. For example, Dr. Golin stated that Dr. Nussbaum "overestimated" the severity of Plaintiff's functional restrictions, and his opinions regarding her "abilities in the area of making personal and social

---

[18] Dr. Golin refers to Dr. Rydze as a treating source and as a psychiatrist. (Tr. 315.) Neither of those descriptions is supported by the record. Dr. Rydze apparently examined Plaintiff on one occasion at the request of the Pennsylvania Bureau of Disability Determination and there is nothing in his report which describes him as a psychiatrist. Similarly, Dr. Nussbaum was a one-time consulting examiner, not a treating physician.

26

adjustments [were] not consistent with all of the medical and non-medical evidence." (Tr. 314.)   However, he does not provide a single factual example of such overestimations or inconsistencies. *See* <u>Hippensteel</u>, 302 F. Supp.2d at 393 (weight given to the opinion of a non-examining source will depend on explanations provided or satisfactory contradictory evidence supporting such opinion.)

Similarly, Dr. Golin concludes that Dr. Rydze's statements concerning Plaintiff's abilities in the area of work-related activities "are fairly consistent with other evidence in [the] file." (Tr. 315.)   However, regarding such activities, Dr. Rydze stated Ms. Williams "frequently has outburst of anger particularly toward men who are in a supervisory role.  She apparently has lost a number of jobs because of this."  Her intensive case manager who accompanied her to the examination related "multiple episodes of aggressive behavior and the fact that Brandie can be verbally abusive to her co-workers and peers.  She has been unable to work because of these actions. . . . Her behavior apparently has caused her to lose a number of jobs in the past."  (Tr. 300, 303.)  Not only does Dr. Golin fail to identify the evidence with which these statements are purportedly consistent, but Dr. Rydze's statements seem to contradict Dr. Golin's conclusion that Plaintiff was, at most, moderately limited in some work-related abilities and was not precluded "from meeting the basic mental demands of competitive

work on a sustained basis." (Tr. 315.)

Finally, Dr. Golin commented that "certain aspects" of a report completed by Dr. Jason Rosenstock on May 22, 2002, were "fairly consistent with other evidence in the file" and with his own determination of Ms. Williams' RFC. (Tr. 314.) The report to which Dr. Golin refers was issued the day after Ms. Williams was released from WPIC. (See Tr. 231-233.) While there are notes about Plaintiff's affect, mood, speech, behavior, hallucinations, paranoia, and inability to maintain concentration, a careful review of that document reveals nothing, in this Court's opinion, which supports Dr. Golin's statement that Dr. Rosenstock expressed any opinion about Ms. Williams' "abilities in the area of other work-related activities." (Tr. 314.)

To the extent, then, that the ALJ adopted limitations described by Drs. Golin and Dalton, those limitations themselves may not have been based on substantial evidence since Dr. Dalton's report did not consider the entire medical record and Dr. Golin's conclusory report may have misrepresented some medical evidence.

The Third Circuit Court of Appeals has held that the ALJ is required to set forth the reasons for his decision and remand is necessary where the "ALJ's conclusory statement [is] . . . beyond meaningful judicial review." Burnett, 220 F.3d at 119. As the same Court recognized in a later case, while the ALJ is not

28

required to use particular language or adhere to a particular
format in conducting his analysis, he must sufficiently develop the
record and explain his findings so that the district court may
conduct such a meaningful review. <u>Jones v. Barnhart</u>, 364 F.3d 501,
505 (3d Cir. 2004). Here, the ALJ's analysis of the medical
evidence fails to address a significant hospitalization and months
of treatment for the exact impairments on which Plaintiff based her
claim of disability. The WPIC medical records from 2002-2003
create a potential conflict with Dr. Cohen's report. While we
recognize that if there is substantial evidence in the record to
support the ALJ's findings, this Court is bound by his
determination, evidence cannot be considered substantial if the ALJ
fails to consider all relevant evidence or fails to resolve
conflicts created by countervailing evidence. Where the ALJ does
not mention significant contradictory findings, the district court
is left "to wonder whether he considered and rejected them,
considered and discounted them, or failed to consider them at all."
<u>Fargnoli</u>, 247 F.3d at 44. Consequently, we are unable determine to
if the ALJ's conclusions herein were supported by substantial
evidence and therefore conclude remand is necessary.

    2. *Failure to pose proper hypothetical questions to the
VE:* Because we have concluded the ALJ may have failed to consider
the treatment records from WPIC in determining Plaintiff's residual

functional capacity, it follows that the hypothetical questions posed to the Vocational Expert may not have accurately set forth all of Ms. Williams' work-related limitations. A proper hypothetical question must reflect "all of a claimant's impairments that are supported by the record" in order for the response by the vocational expert to be considered "substantial evidence" upon which an ALJ may rely in reaching his determination of a claimant's entitlement to Social Security benefits. <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987).

Plaintiff argues, in effect, that if we were to accept the VE's answer to the hypothetical question posed by her counsel at the hearing, we would be compelled to grant benefits without a remand. (Plf.'s Brief at 8, 19.) However, analysis of the WPIC medical evidence may or may not support all the limitations in counsel's hypothetical posed at the hearing. Therefore, the preliminary step - one which is reserved to the ALJ - is to reconcile Dr. Nussbaum's opinions with *all* the medical evidence, including the WPIC psychiatric treatment notes. Only at that point may a proper hypothetical question integrating Plaintiff's exact limitations supported by medical evidence be proposed.

## V.   **FURTHER PROCEEDINGS**

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final

decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Because it is unclear (1) if the record here was fully developed by soliciting and considering medical evidence from the period April 2003 through September 2004 and (2) the consideration (if any) the ALJ gave to the records from Western Psychiatric Institute and Clinic in arriving at his decision to give greater weight to an opinion which did not consider her hospitalization and treatment in 2002-2003, we conclude that remand is the proper resolution. On remand, should an additional hearing be required, questions posed to a vocational expert should incorporate any additional mental limitations supported by the medical evidence.

An appropriate order follows.

September _28th_, 2006                 _William L. Standish_
                                       William L. Standish
                                       United States District Judge

31

cc:  Karl E. Osterhout
     1789 South Braddock Avenue
     Suite 570
     Pittsburgh, PA 15218
     Email: karl@keolaw.com

     Paul Kovac
     United States Attorney's Office
     700 Grant Street
     Suite 4000
     Pittsburgh, PA 15219
     Email: paul.kovac@usdoj.gov